Good morning, your honors. Good morning. Edward Ward, representing the Appellate Sierra Club and others. I'd like to reserve four minutes for rebuttal, if I may. Before we start, sometimes I'll look at a case and I'll ask myself, I ask myself a lot of questions later, and I ask myself, why are we here? So maybe you can help me understand why I'm missing about this case. Both sides responded to our request about the remedy that you were seeking. There was a motion for a preliminary injunction that was, if I recall the record, that was denied. Yes, your honor. The project went forward, and we saw to the information that we requested, we were told at that time, I don't know what it is today as we speak, but at that time that was submitted, the only portion of the project remaining unfilled was 0.12 acres. That is, according to my calculation, 20.3 feet by 20.3 feet. The dimensions of this courtroom are approximately six to seven times greater than the amount of contaminated reed trapped between the giant playing field and the Pennsylvania Turnpike or Island Divide that we're fighting about. So why are we here? Thank you for asking. We're here for more than that. You're absolutely right. That's the only portion that remains unfilled. 20 feet by 20 feet. That's correct. But there are portions of the wetlands that have been filled significantly, one and a half acres that have been filled, but no construction has taken place on it. I think it's important to understand the stat. So what was the remedy that you're asking for? The remedy for that 1.5 acres would be to restore those acres. Now, wetlands restoration is ordered all the time. It's not uncommon and can be done. And I think it's a legitimate remedy here. Our argument is that these wetlands never should have been filled at all. I understand that we're sitting here today and we're not seeking to tear down a building. Given that the failure to appeal the ruling on the preliminary injunction, why hasn't that issue been waived? It's not in the briefs, but as I was reading it, it seemed to me that to the extent that latches may even be floating around here. Again, that's not brief. No one's arguing that. But if you file for a preliminary injunction, that's denied. The case goes forward and then is disposed of on a summary general, which is then appealed. Meanwhile, the project is going forward as it very well could since there's no injunction in place. It seems to me you then are, no pun intended, pretty soggy ground trying to put the toothpaste back in the tube. Your Honor, I would submit that there's not, with respect to the wetlands, there's not a great deal. The wetlands were filled within 70 days of the permit being issued. So by the time I had a decision from the preliminary injunction from the trial court, those wetlands were filled. So the situation today is not significantly different than it was then. Now, with respect to the construction on part of that well, it's on six plus acres of wetlands. That construction is there. There's nothing. We do not ask the court to tear down the building. We do not ask that those wetlands be restored. With respect to the 1.5 acres of wetlands and the 0.12 that Your Honor mentioned, it is not too late to preserve them. And we submit as a matter of law they never should have been filled in the first place. That's the revenue under the Clean Water Act. What is planned to be built on the 1.5 acres? On the 1.5 acres, it's proposed there are two of the office towers and the associated parking of those office towers. That construction has not begun, and I don't believe it's even slated to begin. I think it's important to understand the status of the project. The entertainment retail piece of the project is well under construction. That's the piece that they intend to open. That's the 5.3 acres. That's the 5.3 acres. That's right, Your Honor. And they intend to open that in November. But the rest of the site, 25 acres of the site, has no construction. The ball field has not started construction. The four office towers, the associated parking, the hotel, there's no construction on any of those portions of the site. To the extent that with respect to the Clean Water Act, only that 1.5 acres is that is not under a building and on the site. The 25 acres, I bring that up for two reasons. One, it goes to the NEPA question. The NEPA issue here is that the Corps failed to assess the traffic and air impacts on its site. And that is the significant environmental impact that remains. That hasn't changed at all. They did. They talked about traffic congestion. Are you saying the air quality as opposed to the traffic congestion? No, the two are connected, Your Honor. Traffic congestion will lead to air quality impacts. They did look at the traffic congestion. They determined that reconfiguring this or even stacking it would cause greater congestion or result in—unless I'm just reading the record—result in a configuration which would be impractical. The site is located right off the Jersey Turnpike. So we're not talking about a site that has limited congestion to begin with, the traffic. Well, I think we are talking about a site that is quite congested. And the state hearing officers said that they should look at a number of intersections around the facility. The only—what was before, the state—the acting Army Corps of Engineers, when the public comment period closed, was only an analysis of the traffic on the site. And what the state hearing officers said was you have to look at other intersections. You have to look at the traffic congestion here. I thought they didn't do that. They looked at the impact. With any traffic area, obviously, you can't look at just that one limited spot because it has impacts that reverberates out as to the highway arteries feeding it. That's correct. They did not look at that until after—long after the comment period was closed here. So that was not on the record. The Sheriff Club had no opportunity to comment on that. The record closed. Okay, but now they have looked at it and determined that the NEPA regulations are— there's not a problem with that. Is that right? Well, the agency has made that determination based upon information that was not in the record before the comment period closed. And this is an issue that my clients and others raised months before the comment period closed. And, indeed, in the state hearing procedure in April of 2004, a year before the decision was made here, the Mills Corporation, in response to our testimony, came in and said, you're right, we will do the traffic analysis. We promised to do it. The sports authority came in and said the same thing. Despite that, they did not do it before the state record closed, nor did they do it before the federal record closed. So my clients have had no opportunity to comment on the studies. Well, have you seen the analysis that they did? Yes, we have. And we say that that analysis is inadequate. They did not look in that analysis at all the intersections that the state hearing officers asked them to look at. And traffic congestion is— the good news is that none of these impacts have occurred yet because the facility hasn't opened. So it's not—we have a meaningful remedy can result from this case, and that is that this traffic analysis should be done. The public should be given an opportunity to comment on it. And then we can look at what mitigation might be brought about. Looking at the issues as you framed them, you have seven issues in your brief. Are you addressing yourself to the last issue, that is the failing to provide public notice and comment on that? That is one of the issues, Your Honor. But that is really connected to the National Environmental Policy Act issue, which is the failure to analyze the traffic impact and the air quality impacts. And the two are connected. One, there was a failure to analyze them, and two, we had no opportunity to participate in that analysis because the critical documents, the transportation analysis and the conformity determination were not in front of the Corps when we had an opportunity to comment. The State Department of Transportation, the EPA came in and said, these are analyses that need to be done. And they were not done. The traffic impacts, as I said, have not taken place yet because the facility hasn't opened. What is your basis for saying they needed to be done? The authority is the National Environmental Policy Act. The issuance of a clean water permit is a major federal action significantly affecting the environment. The most significant effects here are the traffic and air quality impacts. Those are the effects that have been ignored here. Now, the effect is not caused by the filling of the wetlands. Is that correct? In other words, the activity that was permitted here was the filling of the wetlands. The filling of the wetlands itself produced no traffic or congestion, correct? That's correct. And the Army Corps regulations say that structures built in the waters of the United States on top of that fill, they must examine the impacts of that. Where is that? Where is that? Yeah, give me a chapter. It's 33 CFR. Excuse me one second here. 33 CFR Part 325 Appendix B, 7B, and 3 is the one that is particularly applicable here. If an applicant seeks a DA permit to fill... Wait, give me that site again. I'm sorry. 33 CFR Part 325 Appendix B, Section 7B, 3 is the one that is most directly pertinent. That means if an applicant seeks a permit... That's an example. That's correct. That's correct. But it's an example that applies precisely to the issues of this case. But the scope, the introductory aspect of that regulation discusses the scope of the analysis and talks about a specific activity which requires permitting. And the activity here was the filling of the wetlands. The activity was the filling of the wetlands. But then the Corps breaks say you have to look at what's built on those wetlands, those structures. And there is discretion in the district engineer whether to extend that NEPA analysis to the entire project. And we argued that in the trial court. And we've abandoned it here because the trial court conflated those two issues. One, whether the analysis, the NEPA analysis, should extend to the entire project. But you're not arguing that now. We're not arguing that now. But we are arguing that it has to encompass what is actually built on the wetlands. And that... But they did do that. You're saying they went around. They did not do that, Your Honor. They did not. Are you talking about the traffic impact? That's correct. That's correct. They only looked at what was on the actual act of filling itself. They did not look at the structure. You're saying that they didn't look at the traffic, we're talking NEPA now. Yes. They did not look at the traffic implications of filling the wetlands. That's what you're saying. Of filling the wetlands to build something on top of it. They looked at the traffic impact of literally pushing the soil into the wetlands. They did not look at the impact of the traffic and the air quality impacts that the structure on the wetlands would create. This facility is expected to generate thousands of trips. This is a very congested area already. But then doesn't that implicate the scope? Because what were they supposed to do? Look at the impact of the one acre or the five acres it's built upon and then not look at anything else? I think it's a fair question. How do you do that? I think what they have to look at is the structure that's on the wetlands. And that structure, as you know, extends beyond the wetlands. But I don't think we need to go to the entire project because the entire project includes a whole set of components. What's your best case authority for this proposition that if someone fills the wetlands and that's the permitting activity, it's not sufficient for the Corps just to look at the filling, but they must examine the impact of what's on top of it? I start with the regulation itself. And the Sonoran Desert case from the Ninth Circuit, and this is not authority binding on this Court, but the Southern District of West Virginia actually reviewed the district court decision in this case and found that if you read the regulation the way the district court did, it becomes meaningless. You just look at literally filling the wetlands, and then you don't look at what's on top of the wetlands. I was sure that they did do that. And I understand you're saying that you're not content with what they did because you didn't have a chance to comment on it. But that's definitely not saying they didn't do it. They took a position that they did not have to do it. They took the traffic impact of what was going to happen after they throw it away. That's correct. After the public comment period was closed, they got this transportation analysis that we did not have an opportunity to comment on. They also approved seven new transportation projects and a contribution of $71 million from the applicant. Our clients had no opportunity to review that. We submit that the analysis is inadequate and that those projects are not adequate. But without an opportunity to review that record and comment on it, we can't go beyond that. Can we reserve some time, I think, for rebuttal? Yes. So let me move to the other side, and we can come back to you. Thank you, Ron. Mr. Gray? May it please the Court, Michael Gray on behalf of the Corps of Engineers. I'd like to start with the question of the 1.5 acres on which no construction has yet been done, but they have been filled in, that Mr. Lloyd said. 0.12, I thought it was. Well, there's 0.12 that haven't been filled at all. He said there's another 1.5 that have been filled, but he would seek to have that filled. I would note that the Corps in its analysis, this is at Joint Appendix 123 and 124, these are the Cedar Creek wetlands. It's noted that the site remediation program of the New Jersey Department of Environmental Protection has designated the wetlands of Cedar Creek, where the office buildings and parking structure will be constructed, to be historic fill containing low-level contamination, exceeding state soil cleanup criteria. As a consequence, the New Jersey Department of Environmental Protection has authorized the contamination in the remnants of Cedar Creek to be remediated by filling the area with clean material and covering it with an impervious surface. Well, that's my understanding, too, but I got, there's so many things going on here while I was tracking, but I do remember reading that part of this area was itself contaminated, and one way to remove the contamination was to fill in the area. That's right, to keep it from spreading to other adjacent areas. I'm not sure if that's the area he's talking about, looking at the traffic flow. I don't think that 1.5 acres is something that should keep this case fit for judicial review. Neither do I think that the NEPA public notice issue should keep this case fit for judicial review. They argue that we could study traffic and air quality impacts, which, of course, have no relationship to the Corps' jurisdiction in this case, which is over the wetlands. The most that the Corps can do with traffic and air quality is reject a permit. The 33 CFR section 325.4C makes clear that if the district engineer determines that special conditions are necessary to ensure the proposal will not be contrary to the public interest, contrary to the public interest is where traffic and air quality considerations would come in in a wetlands review, but those conditions would not be reasonably enforceable. Now, I don't know how the Corps could reasonably enforce a condition regarding traffic and air quality when the state itself is undergoing a regional analysis of how to deal with traffic problems, caused not just by this project, but by development in general in the area. If those conditions would not be reasonably enforceable, but they're necessary to ensure the public interest, then the only option left to the district engineer is to deny the permit. Well, clearly, the district engineer can't deny the permit at this point. Now, there's a question whether the district engineer could reconsider the permit based on those things, but reconsidering the permit on a public interest analysis where you have a billion-dollar structure and 0.12 acres left in on the basis of air quality and traffic impacts that the state itself is taking into account simply, I think, is not something that is going to be reasonably possible here. You agree. You concede you did not look at the traffic and air quality. No, I do not concede that at all. In fact, the Corps stated... Before the permit period ended. In your analysis, your study under NEPA. In the study under NEPA, the EA, in Joint Appendix 191, says the Corps also investigated and considered potential effects of the applicant's project on a broader scale beyond the Corps' scope of analysis. So what the Corps made was a two-level determination here. It said we don't have to analyze these things, but we've also done it. So if you look at, for example, J.A. 160-162, the Corps talks about indirect economic effects, considering the project as a whole. 162-165, you have an air quality discussion of the project as a whole, relying on the state agency's analysis. It's a project as a whole, including any building that might be built on the land? No, that's right, including the building. And if you look at 166-168, you have indirect noise impacts. The reason they're indirect is the Corps said the direct effect of our permit here, for noise, for example, is the bulldozers pushing things around and pile drivers. The indirect effect is they're going to build a building on it, and that's going to cause increases in noise from traffic and everything else. And then 168-171, you have indirect traffic effects, considers. It relies on the state agency's analysis. How about here? It relies on the state agency's analysis. Is that permissible? Or do you have to look into it yourself? No, I think it was permissible for the Corps to do that, to rely on the state agency's analysis in this case, because what we're talking about is air impacts, traffic impacts, and those are things that come in sort of the general catch-all Corps of Engineers public interest reviews in a wetlands permit. So you looked at traffic. Did you look at air? Yes. Air quality was 162-65 in the Joint Appendix. In your briefing, you were taking the position that, I mean, I don't recall you saying you did do these things. You took the position that you didn't have to. That's correct. We don't have to look at the project as a whole. And, in fact, the appropriate scope of analysis under the Corps' regulatory factors, the district engineer has the discretion to determine what the scope of analysis will be. You start with the impact of the fill. Is that because you don't have NEPA authority? Excuse me? Is that because you don't have NEPA authority? That's probably not the right word. NEPA responsibility. Right. The question that the district engineer has to ask himself is, how much NEPA responsibility do we have given the facts of this particular project? And what the district engineer said is, our control is only over wetlands, right? That's where our jurisdiction is invoked. What we have control over. So, clearly, we have to look at that. And then the question is, do we have – does that give us enough legal control over the rest of the project to federalize it so that NEPA requires it as a major federal action? And that's the inquiry. That's kind of a horizontal inquiry, right? The scope of analysis. Right. This piece or the whole thing. But how about this piece? Aren't there cases – and I know there are cases – where they fill the wetlands and then the Corps also has to assess what's being built on top of the wetlands. For instance, a golf course or trees are going to be felled or something in addition to the filling of the wetlands is happening. And there are clearly cases where it's asinine to think that all you have to do is look at the wetlands filled and the impact of that, the impact of which is filling the wetlands, without looking at what's on top of it. And don't you agree you had to do that on your own as part of your analysis? No, not in this case. I mean, I think you have to look at the facts of every case. And there will be some cases where, for example, you might have filling in of some wetlands to build a dock, you know, as part of a larger project. And it's pretty clear that, you know, the dock or whatever structure that's sort of isolated on the wetlands, that, yeah, you should look at the impacts of that on, you know, boat traffic or whatever. But here, the plants have sort of tried to segregate the project into the entire project and the parts that are on the fill. But that is really sort of – it's unclear to me how you would engage in the sort of analysis that they're talking about, traffic impacts and air quality. I thought you said you did do that, though. I thought you said you did do that. No, we did. I'm addressing sort of the predicate question that Judge Rendell asked us whether we had to or not. I mean, I certainly believe that we did. Are you allowed to make – is the engineer allowed to decide that under the regulations? No, the regulations give the engineer the – clearly give the engineer the discretion to determine what the scope of the analysis will be. That's right. On a – really, it addresses a horizontal piece. Is there any – I mean, when you look at Appendix B7B, scope of analysis, it's talking about this piece of the project versus – No, that's right. And, again, that's an example, and what I'm arguing is that in this case, it really doesn't make any sense for the impacts that they're talking about to try to segregate the project into those two things because they're talking about traffic impacts and air quality impacts. This is a mixed-use project that's designed intentionally for all the components to act together. And so it – and the biggest part of it, of course, is the entertainment and retail part, which is the part that sort of sits – you know, it expands beyond the wetlands but sits on it. So how do you look at traffic impacts caused by the part of the retail complex that sits on the wetlands? Well, then it says, if you want to fill the wetlands, make your project big enough so that they'll argue that they don't have to look at the specific impact on the wetlands because it's so big, how are you supposed to – Well, no, I don't think anybody – nobody has questioned, in this case, that the Corps considered all of the impacts on the wetlands. I mean, what they're saying is we should have expanded beyond looking at wetlands and looked at secondary impacts of traffic and air quality. And the Corps has to make a decision, do we have enough control over this project as a whole in order to justify our looking at those sorts of secondary impacts from allowing to fill? And what was the answer in this case? The answer was no? The answer was no, we don't have to do it, but we're going to go ahead and give you an analysis anyway. And so you have actually both things here. But the Corps certainly believes that it is not required under the regulations and that the district engineer certainly did not arbitrarily or capriciously decide that, in fact, it would not extend the scope of analysis beyond the impacts to wetlands. Let me – can I – let me return just for a second to the mootness issue. I heard your argument, but I thought it related mostly to the Clean Water Act. Would the mootness consideration be any different under NEPA? Well, I think, you know, I think the argument I was trying to make under NEPA is that the scope of the – the Corps' ability to offer any of the remedies that they're talking about, which would be mitigation to traffic and air quality, is not really within the Corps' ability to offer at this point in time because under the regulations for those sorts of impacts that are under the public interest review. The Corps, when they're not reasonably enforceable by the Corps, in other words, the Corps can't mandate that New Jersey build, you know, a new road or enforce, you know, traffic impacts in that way, then the only option is to deny the permit. And clearly the permit here can't be denied at this point or revoked at this point in the process. Thank you. Thank you. Thank you. May it please the Court, my name is Eric Murdoch, and I'm here on behalf of the Meadowlands Developer Limited Partnership, which is the holder of the permit issue in this case. If I could just take a step back for one minute, there's been a lot of discussion, but we believe the Corps can dispose of this appeal by focusing on really just two fundamental issues. First, we believe the case is moved. A careful analysis of the facts of the case as it stands now, really the kind of analysis, Judge Jasima, that you did in your Ninth Circuit case in 2006, Oregon Natural Resources Council, which is BLM, will show that the appellants here can no longer obtain any meaningful relief, even the kind of relief that they've pointed to, and I'd like to come back to that in a minute. The second issue, though, is that the appellants have simply not carried the heavy burden that they must in seeking to overturn the Corps' permitting decision. Every issue that they've presented on appeal really boils down, at its core, to appellants' disagreement with the Corps as to matters that are within the Corps' decision-making discretion. The Corps' decision is that the exercise of that discretion is entitled to substantial deference. The permitting decision is presumed to be valid. As Judge Pisano correctly found below in a decision that we commend to you for being thorough and well-reasoned, the Corps' decision to issue this permit was reasonable and amply supported by the facts and the record. And, in fact, we would refer the Court to Judge McKee's 2003 unpublished decision in Lesser v. C.D.C., made not as legal precedent. You dig all these RTA cases up, or do you have a staff back home? Well, I certainly have some help, Judge McKee. No, wait, I want to hear what he's going to say. He said not as legal precedent. Yes, it's not as legal precedent, but as the appropriate template for disposing of this appeal. In the Lesser case, which involved issues of administrative law similar to those here, the Court endorsed Judge Pisano's decision below, commending his thorough and careful analysis in that case, and summarily dismissed the appeal. And we would submit that the same approach would be appropriate here. The same issue? It's issues involving the challenges under the APA to the agency's discretionary decision-making, including McKee. No, I didn't say anything in that opinion. I just said they affirmed for the reasons set forth in the district court opinion. It sounds like I didn't say anything. Well, I think in that case, Judge McKee, you looked at Judge Pisano's decision below, which was extensively, and as you said in your opinion, it was thorough and it was characterized by thorough and careful analysis. I think the same thing can be said of Judge Pisano's opinion here. I think that's certainly an appropriate way to deal with this case on the merits, if you need to deal with it on the merits. Let me turn for just a second on these issues, because there are a couple of issues that I think are important to clarify there. Mr. Lloyd mentioned that the relief that they're hoping to get out of this case is restoration of the areas that have already been filled, or at least the areas in which nothing has been built. I think he's mistaken in the assertion that that relief is actually available to him in the context of this case. If what was said about the contamination that was in there, that is part of the record, does that mean putting back the salmonella or whatever else was contaminating the area? Well, Judge, I don't think anyone would presume that you would restore the contamination as part of restoring the wetlands. But I think the real key issue here is that the court's only authority to actually require restoration of an area that's already been filled arises not in the context of its permitting regulations, but in the context of its enforcement regulations, would require an entirely separate proceeding by the court that would not be necessarily triggered by a remand in this case. In fact, we don't think this is a case where enforcement would be appropriate at all, because the filling was done in accordance with the permit at the time. If the permit was improperly issued, you're saying the court is without authority to – forget their enforcement powers. How about our authority to say it shouldn't have been done, restore it to status? Undo it. Well, I think, Judge Randell, that really this court's role in this case is not to decide what the appropriate regulatory approach is. It's really to – under the APA, if you look at your Supreme Court's Float or Rock case, it's really to – if it deters that the agency did not make its decision properly, to send it back to the agency. But what do we do about that? To slap them on the wrist? Or don't we grant some form of relief? I think the relief that you grant is to set aside the permit and remand to the agency. That's very clearly what's the appropriate role of the court in the APA case. Now, as far as – But isn't that the reason for the mutinous doctrine that if it's already been filled, what's the point of trying to decide whether the permit was, you know, permit was validly issued or not? Yes, Judge, I think that's exactly right. I think that the point, the fact that these areas aren't even filled and they could not be unfilled except through the exercise of the court's independent enforcement discretion. But Mr. Lloyd says, as a matter of fact, they can be, if we decide that the permit needs to be set aside. They can be refilled. He said it was done – I'm not sure he said all the time. He said it's done with some regularity. So then what – and I'm not saying that this is what the legal result ought to be. But if it is, what is the problem? And I was being facetious, obviously, with saying put back the contamination. But what is the problem with refilling it? Well, I think the issue, Judge McKee, is that restoration of these areas is not relief on which the appellants in this case can rely to avoid mutinous. And the reason for that, as you've noted yourself in prior cases, that the mutinous inquiry is really so the other side of the coin is standing. The Supreme Court has made clear that where addressability in a standing case depends on the unfettered discretion of a third party, in this case the court's unfettered discretion to decide whether or not to bring – to use its enforcement authorities to require restoration is not sufficient for purposes of standing, and thus it's not sufficient to – in terms of a meaningful relief that the appellants here can rely on for purposes of avoiding mutinous. That's the point we're trying to make. Even if the entire process was the result of an abusive discretion? Yes, that's correct, even if that's – the whole idea of the mutinous doctrine is that it's independent of whether the court's action was appropriate in the first place. If there's no longer meaningful relief that the appellants are entitled to as a result of this case, then the case is moot. Now, I see my time is up. Any other questions? Thank you. I'm going to try to do these in reverse order of what I heard. Let me start with the mootness. Even if you accept Mr. Murdoch's argument about mootness, we would then fall under one of the exceptions to mootness, because what his argument is, is we have a situation here that is capable of repetition, likely to be repeated, and what he's saying is we have no recourse, because those wetlands were filled in within days of the permit being granted, and therefore we're out of luck. I don't think that's the law. I do think that upon remand to the court, they have jurisdiction. And as Judge Rendell said, if this court determines that that fill was illegal, I think the court has discretion to restore them. And as a fact, there's an exception to the mootness doctrine which says capable of repetition, and we have an inherent situation here where you have a wetlands permit. Well, it seems to me in most environmental cases I've been familiar with, that doesn't apply because the way you avoid it is if your case is strong enough, you get an injunction pending appeal. That certainly is one mechanism, Your Honor. This court has also held that a stay of 45 to 90 days may not be adequate to allow for judicial intervention and solution to these cases. So I think that that is one option. It's not the only one, and I don't think it defeats the ability to remand, to declare this permit illegal in an emergency agency. No, it's not defeating the ability to remand. It's making the capable repetition doctrine inapplicable because you do have an interim remedy if your case is strong enough. Well, effectively, I'm not sure you do if the wetlands are filled as fast as they are. At least in the Ninth Circuit, there are a lot of cases where there are, as you know, injunctions pending appeal are granted in environmental cases. Indeed. But as I said, by the time we were denied our preliminary injunction, the appeal had already taken place, so I'm not sure we would have been in the same situation we're in today. Mr. Lloyd cited about 11 pages of the record where he contends there was sufficient consideration of the economic impact, air quality, et cetera. What's your take on that? Your Honor, the reliance in that section was on this transportation analysis that was done after the fact. And let me come to the special conditions. I think the remedy here, it is a public interest review, and if the court were to do the analysis, the air quality analysis and traffic analysis that we seek, the special conditions in this permit were they said that because seven transportation projects had been proposed and because the applicant had put forward $71 million in funding that they met the air quality standards. We submit that it's very possible that if we do the traffic analysis that hasn't been done, that there may be additional appropriate mitigation measures, transportation measures, that would be found by the court to be special conditions upon which a public interest review could rest, as was the one that was done here. Is it your position that if there's .5 acres of wetlands in a six-acre parcel where there's going to be construction, that the court must look at what's going to be built on the .5 acres because that's the wetlands? Or is it your position that they have to look at the entire, no matter how small the wetlands piece is, in addition to the fill, they have to look at what's on top of that small piece, or they have to look at what's on top of everything? I think they have to look at the structure that's on top of that fill. But how about Mr. Lloyd's statement that that could be the ladies' rooms of the movie theater and the accounting office? I think your point was well taken. My client's position in this would have been, we have 25 acres of this site that's never been touched today. We already, while the permits proposal was issued, reconfigure it and protect the wetlands. And then there's no federal jurisdiction here at all, and we don't have to fill the wetlands. I don't think you can cover a piece of wetlands with a structure and then say the court has no jurisdiction. When you talk about the land being open, there are leaseholding permits on it. It abuts the county airline terminal, which is a major component of how this thing was put together to begin with. It's not as though they just have free-flowing acres that they can go in and play around with and create alternatives to what they've done. And they looked at a lot of those things. These 25 acres that haven't been touched yet and haven't begun to construct them, they're also, as we pointed out, the sports authority has 175 acres of parking lots. So there are opportunities here. In the redevelopment agreement with the sports authority, there was an agreement that the hotel might move to the racetrack off of this site. There was an agreement for shared parking. So there are opportunities to look at alternatives. And because we have this 25 acres still existing, that can't be done in that way. Again, may I wrong, but I thought that they did look at, maybe not satisfied with the result of the inquiry, but I thought they did look at the kind of reconfiguration and alternative uses, alternative footprints that you're suggesting would be relevant. They did look at those. And what we argued in the brief, and I won't repeat it here, is that they used the wrong factors. There were three specific factors they were supposed to use, and they did not use those. If I can mention one thing before I sit down, if I may. Council argued that the state had reviewed this decision and was comfortable with it. I don't think that's really the case. I think your honors know that there are two appeals pending on the two state decisions here, and they were already in January and we're waiting on an appeal for them as well. So I don't know that it's appropriate to say that the state is fully incurred in the status of this project. Thank you. Thank you. Very well-argued case. It kind of reminded me, looking at this, I don't know if anybody has ever read Ibsen's Enemy of the Public, Enemy of the People, I'm sorry. It kind of reminded me of Ibsen a little bit, the non-economic component of that play. I take that as an advisement. Thank you for a very helpful argument.